## Glover v. Nunnemacher, et al.

(Decided November 14, 1924.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

Conspiracy—Real Estate Broker Held, Under Evidence, Not Guilty of Conspiracy to Unload Worthless Stock of Coal Mines.— Real estate broker, participating in sale of and becoming, with plaintiffs, purchaser of coal mining stock, held, under evidence, not guilty of conspiracy to unload worthless stock on plaintiffs.

BEN F. WASHER, FRED FORCHT and JERRY HOGAN for appellant.

THOMAS A. BARKER and ALLEN P. DODD for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Reversing.

The Brownie's Creek Coal Company owned and operated a coal lease in Bell county. Its whole capital stock was either owned or controlled by McRhea and Wilson. Some time prior to the transactions here involved they had given to one E. A. Pollard, of London, Kentucky, an option to sell the whole of the capital stock at a price of $19,600.00 net to them. Pollard had associated with him in the effort to sell this stock one James Williams, also of London, a real estate broker dealing chiefly in coal and mineral lands.

Appellant Glover was a real estate broker of Milwaukee, Wisconsin, and during some trips he made to eastern Kentucky on business he met Williams. After Williams became interested in the sale of this stock, he wrote to Glover and suggested that he aid also in the consummation of such a sale, and giving him an outline of the property, and expressing the opinion it was a good investment. Glover at the time had never been to the property and had no knowledge or information about it, except that contained in Williams' letter.

Accordingly Glover approached Droppers, a business associate of Nunnemacher and a friend of Franks, with all of whom in one way or another Glover had theretofore been associated in business deals. They all knew that Glover's occupation was that of a real estate agent or broker, and when Glover first approached Droppers he showed him Williams' letter, which he knew was the only information Glover had about the property.

After a conference between Nunnemacher, Droppers, Franks and Glover it was decided that Droppers and Glover should come to Kentucky and investigate the proposition, Droppers acting for himself, Nunnemacher and Franks.

They came to Kentucky and went to the mine, McRea, Pollard and Williams going with them. Droppers, although not a practical mining man, professed to have and did in fact have some knowledge of such things as shown by his investigation. He with the others took miners' lights and went through the mine; at several places he took the dimensions of the coal vein, and in other ways investigated the physical conditions of the property and its equipment. He took a sample of the coal and afterwards had it analyzed at Milwaukee; he went back to the office and investigated the books, the price of coal and made such other investigation as a cautious business man would. He went back to Pineville, the county seat, and there consulted a banker as to the value of the property.

The parties then returned to Louisville, and there at a meeting of them all an option was given by Pollard, McRea and Wilson to Droppers, Nunnemacher, Franks, Glover and Williams to purchase the captal stock of the corporation within ten days for the price of $30,000.00, each of the five named to pay $6,000.00, and thereby become the owners of the whole capital stock, for which option $300.00 was paid by Glover.

Glover and Droppers then returned to Milwaukee and there, after a conference with Nunnemacher and Franks, it was agreed they should exercise the option and become the owners of the capital stock as stated. Accordingly a few days later Droppers and Glover returned to Louisville, where they met the other parties, and the matter was closed by a written contract. The contract is dated the 19th of February, 1918, and is signed by each of the seven parties named, Droppers signing for himself and as attorney in fact for Nunnemacher and Franks. Pollard was not a party to the contract, although he was present and participated in the negotiations.

The purchasers that day took charge of the corporation, increased the capital stock to $45,000.00, and continued its operation with Williams as the superintendent or manager.

However, before closing the deal on the second trip, Droppers and Glover again went to the property and there again Droppers made an additional investigation which apparently corroborated his opinion after the first investigation, for they in a day or two went to Louisville and closed the deal as stated.

At the time this contract was entered into the price of coal at this mine was fixed by the federal fuel commission at $4.00 a ton, and the mine was being operated at considerable profit; some two or three months after that the coal commission reduced the price to $3.10 a ton, and some time later to $2.85 a ton. In the spring of 1918 there was a strike of the miners, and at about the same time an epidemic of influenza was prevalent; still later it was developed that the coal seam was growing smaller and finally, on the 11th of November, 1918, the armistice was signed and the world war came practically to an end. Under these conditions the operation of the mine was no longer profitable, and in February, 1919, this equitable action was instituted by Nunnemacher, Droppers and Franks to rescind the contract of February 19, 1918, upon the ground of fraudulent conspiracy, and asked for a judgment against McRea, Wilson, Williams and Glover for the $18,000.00 they had invested in this stock.

Upon a hearing the chancellor set aside the contract and in adition entered a personal judgment in favor of the plaintiffs against each of the persons named for $18,000.00 with interest from February 19, 1918. From that judgment Glover alone appeals.

The charges of fraud in the petition, so far as they affect Glover, are:

(1)    That he, together with the other defendants, represented that the coal company was at the time producing large quantities of coal, and at a great profit.

(2)    That when the contract was made for the purchase of the stock Glover was supposed to put up $6,-000.00, but did not, in fact, pay anything for his stock.

(3)    That while Glover gave his check for $6,000.00 for the ostensible purpose of covering his purchase, he in fact paid nothing for such stock.

(4)    That all of defendants, including Glover, had entered into a conspiracy for the purpose of defrauding the plaintiffs in the sale of this stock, and that by the terms of such fraudulent scheme Glover, while ostensibly acting with and for the plaintiffs, was in truth acting for the owners of the stock, and that Glover was not to

pay any money for his said interest, and that the giving of the check by Glover was for the fraudulent purpose of misleading and deceiving the plaintiffs and tricking them into the deal.

(5) That the property represented by the stock purchased by plaintiffs was worth less than half what they were induced to pay for it by reason of the misrepresentations and the fraudulent scheme entered into by the defendants.

(6) That plaintiffs did not know that Glover was acting in collusion with McRea and Wilson, and did not know until afterwards that Glover paid no part of the consideration supposed to have been paid by him for his share of the stock.

Each of these charges is put in issue in Glover's separate answer.

So far as Glover is concerned no one of these charges of fraud is sustained. On the contrary, the evidence shows that he, like each of the plaintiffs, was a resident of Milwaukee, and that he had no knowledge of the affairs of the Brownie's Creek Coal Company, or of the property it owned, other than the information contained in Williams' letter to him which he showed to plaintiffs. The plaintiffs knew that Glover was a real estate broker, and they must have understood when he attempted to interest them in the purchase of this property that he was acting in the capacity of a broker in connection with Williams, whose letter they had seen. Knowing that to be his business they could not have assumed that he was interesting himself in the sale of this stock for any purpose except to earn a commission, and the fact that thereafter in order to induce a consummation of the sale he himself agreed to purchase a part of the stock did not and could not have changed the relationship which he had toward the transaction, or which he might have toward the plaintiffs to whom he was undertaking to sell.

They knew if Glover made any representation it was based upon the information he had received from Williams, and with which they were also fully cognizant.

Likewise when Droppers, representing all three of the plaintiffs, came to Kentucky and twice investigated the whole proposition Glover accompanied him, and plainly could not have had any greater knowledge of the property or its value than Droppers himself acquired. So that the charge that Glover misrepresented the value

of the property, and that the plaintiff relied upon his statement, must fail.

Again, the charge that Glover falsely stated that prior to the sale the coal company was producing large quantities of coal at a great profit utterly fails, for the evidence shows that statement to have been untrue.

Again, the charge that Glover paid no part of the consideration for the $6,000.00 of stock received by him in the transaction fails, because the evidence shows that he in fact paid in cash $3,000.00 of that consideration, and paid the other $3,000.00 in the commission which he was to receive under his agreement with Williams and Pollard for bringing about this sale. The only concealment which is shown by the evidence is that he did not disclose to the plaintiffs the fact that he expected to use the commission he was to earn in part payment for the stock he agreed to take. If in fact there existed any confidential relationship between Glover and the three plaintiffs which in good conscience demanded of him that he should disclose this fact, then the question still remains how did it operate as a fraud against the plaintiffs? What possible difference could it have made to them whether he paid the whole purchase price for the stock he was to take in cash, or whether he was to pay part in cash and the balance by cancellation of a debt which the owners of the stock owed to him?

In the first place, at the inception of the negotiations Glover was acting as a broker, and presumably he and the plaintiffs were dealing at arm's length, he with the purpose of bringing about a sale to the end that he might earn his commission, and the plaintiffs seeking to make a profitable investment. He therefore owed them no duty of disclosure. But in the progress of the negotiations he, evidently convinced that it was a fine investment, agreed as an inducement to the consummation of the deal to himself take one-fifth of the stock and pay for it; and the fact that he did pay $3,000.00 in cash in addition to some considerable expense, and also put into the venture the whole of his commission, is wholly inconsistent with the charge of fraudulent conduct or bad faith upon his part.

Manifestly what we have said above effectually disposes of the charge of collusion between Glover and the other defendants. The evidence shows that Glover did not even know the option price of the property held by Pollard, and did not know that Williams was to receive,

under an agreement between Williams, Pollard, McRea and Wilson, his part of the capital stock for his commission. He only knew that he himself was to receive a commission of $3,000.00, which he expected to use in part payment for his stock, and the fact that this was not disclosed to the plaintiffs, even if it had been his duty to do so, operated as no fraud against them.

Clearly the value of the property bought by the plaintiffs was as well known to them when this contract was made as to Glover. Their agent had made two trips and thoroughly investigated the property by two exhaustive investigations. And it is inconceivable that they could have relied upon any representation made by Glover as to the value of the property.

There is a total failure to connect Glover with any fraudulent conspiracy to unload this stock on the plaintiffs, and the fact that he himself paid in cash $3,000.00, to say nothing of the expenses incurred by him, appears to be conclusive that he had faith in the investment, and is wholly inconsistent with any purpose on his part to unload on the plaintiffs a worthless stock.

The opinion of the chancellor below very accurately recites that Glover does not seem to have been taken into the full confidence of Pollard and Williams, but concludes that in as much as he helped in the deception that he was a party to the conspiracy. But the evidence of any conspiracy to which he was a party is totally lacking; if by any conduct of his throughout the transaction he aided the other defendants in carrying out any conspiracy formed by them he was wholly innocent in doing so; for it is not consistent with the ordinary conduct of men that they will enter into a conspiracy to unload a worthless property upon others and at the same time unload the same proportion upon themselves.

We are not unmindful of the general equitable rule that each participant in conspiracy is liable to the persons defrauded to the fullest extent, even though the individual conspirator be not himself a beneficiary of the fraud; but what we are holding here is that Glover is not shown to have been in the conspiracy, and therefore no judgment should have been entered against him.

The judgment is reversed with directions to set aside the judgment for $18,000.00 in so far as it affects Glover, and to dismiss the plaintiffs' petition as to him.